# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# MIDDLE DIVISION

SANDRA S. SMITH,                    )
                                    )
    Plaintiff,                      )
                                    )
    vs.                             )          CV-99-PT-2364-M
                                    )
GTE MOBILENET-CELLULAR ONE          )
                                    )
    Defendant.                      )
                                    )

## MEMORANDUM OPINION

This cause comes to be heard on the defendant, GTE Mobilenet-Cellular One's ("defendant") motion for summary judgment filed on June 30, 2000.

Plaintiff Sandra S. Smith ("plaintiff") filed suit against GTE Mobilenet Service Corp. ("GTE"), claiming age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et. seq.* Plaintiff claims that her immediate supervisor, Randy Brannon, with the approval of GTE's higher management, discharged her from her employment at the Guntersville, Alabama GTE Mobilenet-Cellular One store because of her age. The defendant has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## UNDISPUTED FACTS

Plaintiff was born November 1, 1949. In approximately August, 1996, when she was forty-six years old, she interviewed with Lisa Jenerette and Randy Brannon, GTE store

1



managers, for a position as a sales representative in the Guntersville, Alabama GTE Mobilenet-Cellular One store.  Brannon, the new manager of the Guntersville store, decided to hire the plaintiff, effective September 9, 1996.

When the plaintiff was first hired, she met with Brannon, who reviewed the components of the company's "new hire packet" with her.  [Brannon: p. 17; Smith p. 40-41].  Part of the "new hire packet" that Brannon was to give to the plaintiff was the GTE "Standards of Business Conduct Booklet," which outlines the policies and guidelines for GTE employee conduct and provides procedures by which employees can ask questions or register complaints.  [Ex. 1; Ex. 2].  Although there is some question about when the plaintiff actually received the booklet, the parties agree that she was in possession of the booklet by June 1997 at the latest.  [Smith: p. 41; Brannon: p. 56-57].

Plaintiff's responsibilities as sales representative were to sell cellular telephone services and related products.  Usually, the customer applied for the cellular service over the phone, and the sales representative would "run credit," extending service to the would-be customer after ensuring that the customer had a satisfactory credit history.  [Brannon: p. 41; Smith: p. 56].  Then the customer would have to come into the GTE store, sign a service contract, and allow GTE to "activate" the cellular phone service.  [Smith: p. 56].  The sales representatives were paid commissions.  The standard practice at the GTE store was to give the commission or "credit" for a sale to the sales representative who "ran the credit" for that particular sale.  [Brannon: p. 42-43; Smith p. 56].  Brannon, as retail manager of the store and the sales representatives' immediate supervisor, had the discretionary authority to deviate from this general rule.  [Brannon: p. 45].

During her employment with GTE, the plaintiff demonstrated an above-average ability to

2

sell telephones and accessories, and was frequently the top-selling sales representative at the Guntersville store. [Brannon: p. 132]. However, after almost exactly one year of employment, she was terminated on September 9, 1997 for "continual violations and misconduct with regard to Corporate and local policies and procedure." [Smith: p. 102; Brannon: p. 114, Ex. 5]. The termination was based upon the various GTE policy violations alleged in four written reprimands from Brannon that were signed by Brannon and Jon Luecke, the Retail General Manager. [Brannon: p. 114, Ex. 5]. The documented reprimands are dated December 5, 1996; March 17, 1997; June 18, 1997; and September 8, 1997. [Brannon: p. 114, Ex. 5]. The facts surrounding these reprimands are largely in dispute.

Approximately ten days after her termination from GTE, the plaintiff contacted the EEOC to request that discrimination charge forms be sent to her. The EEOC sent her three documents: An Employment Discrimination Complaint Questionnaire, an assistance pamphlet, and a document entitled "Notice," which outlined the charging process. Smith completed the complaint questionnaire and submitted it to the EEOC on November 3, 1997. On December 10, 1998, the EEOC sent the plaintiff a letter acknowledging the receipt of her "charge of employment against [GTE]." Included in the letter was a document entitled "Charge of Discrimination," which the plaintiff was instructed to sign, date, and return to the EEOC. The EEOC received the signed, dated Charge of Discrimination from the plaintiff on December 16, 1998. The EEOC notified GTE of the plaintiff's charge on March 1, 1999. Subsequently, the EEOC dismissed her charge and the plaintiff was given the right to sue. [Smith: 116, Ex. 11].

## OTHER EVIDENCE

Most of the disputed facts in this case center on the alleged misconduct for which the

3

plaintiff received the four written reprimands that eventually led to her termination.  In addition, the plaintiff alleges several facts that are disputed by GTE.

**The Written Reprimands**

The first written reprimand, dated December 5, 1996, was issued to the plaintiff after two related incidents that occurred on November 29, 1996.  The plaintiff and a co-worker had volunteered to work at the store the day after Thanksgiving, which is normally an additional holiday.  The reprimand claims that the plaintiff locked the doors to the store fifteen minutes before the scheduled closing time, while the store was "full of customers." [Smith: Ex. 6]. Forty-five minutes after the doors were locked, a drunken customer came to the store, was angered to find it closed, and began to make a scene. [Id.].  The reprimand claims that the plaintiff "decided to go out and confront him about his actions" as the customer was walking back to his car. [Id.].  The plaintiff was disciplined for her poor judgment in locking the door early and for placing herself and other customers in danger and the public image of the company in question by confronting the drunken customer.  [Id.].  Although he issued the reprimand, Brannon was not at the store that day. [Brannon: 84].

The plaintiff does not dispute the fact that she locked the doors early or that she was, at some point, outside with a drunken customer.  However, she claims that the drunken customer, a personal acquaintance, was actually inside the store at the time he caused the scene and that she escorted him to the sidewalk in front of the store. [Smith: 66-68].  After she left him on the sidewalk, she returned to the store and locked the doors so that he could not come in again. [Id.: 68].  The plaintiff remembers that at the time that she locked the doors, only seven minutes remained before closing and there was only one other customer in the store.  [Id.: 66-67].  She

4

claims that when she received the reprimand and tried to explain the events to Brannon, "he got up screaming and hollering over his desk and telling me that I was old enough to know better than to do things like this." [Id.: 74]. She also claims that Brannon threatened her with further punishment if she did not accept and sign the reprimand. [Id.: 66].

The second reprimand, dated March 17, 1997, was issued to the plaintiff for an expense report that she submitted to GTE on March 10, 1997. [Smith: Ex. 7]. The reprimand, again given to the plaintiff by Brannon, disciplined her for falsely claiming reimbursement for mileage to an out-of-town company seminar. [Id.]. According to Brannon, the plaintiff rode to the seminar in a co-worker's car, but claimed mileage reimbursement, an action that he and his superiors viewed as "tantamount to theft." [Id.].

Although the plaintiff admits to riding to the seminar in the co-worker's car, she denies that she asked for mileage reimbursement. [Smith: affidavit, para. 15]. Instead, she claims that the money requested on the expense report represented the amount of money that she gave to the co-worker to buy gasoline, [Smith: 84]. and that she had not been informed that money for gasoline was not a reimbursable expense. [Id.: 86]. Unfortunately, the expense report is not in the record because the plaintiff disposed of it when she received the reprimand. [Id.].[1]

The third written reprimand, dated June 18, 1997, was issued to the plaintiff for her failure to ensure that a customer signed his contract before his service was activated. [Smith: Ex. 8]. A few weeks after the customer's cellular service was activated, he called GTE to cancel the service. [Brannon: 104-105]. When GTE informed him that, under the contract, if he cancelled

---

[1]  The court does not understand why the plaintiff did not think that her co-worker's "mileage" claim would include gasoline cost.

5

his service he would have to pay an early termination penalty, the customer replied that he had

not signed a contract, would not pay the early termination fee or past-due bills, and would not

return the telephone. [Id.: 105]. Brannon reprimanded the plaintiff for causing the company to

incur these losses, as well as for another outstanding contract that she had processed without the

customer's signature. [Smith: Ex. 8].

The plaintiff does not dispute that the customer's service was activated before he signed

the contract. She claims that she was not responsible for the premature service activation,

however, because it was performed in her absence and without her knowledge by service

technician Ricky Cash, who was a personal friend of the customer. [Id.: 94-95]. She had

extended the credit to the customer the day before the activation and then left for the day, leaving

the contract on her desk with instructions that the telephone was not to be activated until the

contract was signed. [Id.: 100]. Cash has stated in an affidavit that he activated the service,

knowing that the plaintiff had instructed that the contract be signed when the customer came to

the store to activate his service and that the customer had not yet signed the contract. [Cash:

affidavit, para. 3-4]. The plaintiff claims that she subsequently made several futile attempts to

get the customer to sign the contract. [Smith: 99].

The plaintiff's final written reprimand, undated, is a "Memo for Record" entitled

"Improper Activation Procedures, Failure to Provide Excellent Customer Service." [Brannon:

Ex. 6]. It was written in conjunction with a letter to the plaintiff that informed her of the

termination of her employment with GTE. [Id.: Ex. 5]. The memorandum reprimands the

plaintiff for attempting to take the credit for another sales representative's sale on August 2 and

6, 1997, and for being rude to customers on August 19 and 29, 1997. [Id.: Ex. 6].

6

The plaintiff does not dispute that she had taken the credit for the two customers; however, she claims that she did so with the full knowledge, permission, and assistance of Brannon. [Smith: affidavit, para. 31]. She claims that the August 19, 1997 customer complaint was solicited from the customer by an antagonistic co-worker [Smith: 50] and that she neither saw nor spoke to the August 29, 1997 customer. [Smith: affidavit, para 31].

The plaintiff asserts that while she received written reprimands for these alleged violations of company practice and policy, the other, younger members of the Guntersville GTE store violated company policies with impunity. She alleges that customers had complained about other GTE employees-- including Brannon-- but that she was the only one reprimanded in writing. [Smith: affidavit, para 27; Grimes: affidavit, para. 2-3]. She claims that egregious violations of the company dress code went unnoticed and the use of profanity in front of customers went unchecked. [Sherman: affidavit para 5; Brannon: 153] She also asserts that other employees attended to personal business on company time, using company equipment, and were not reprimanded as strictly or as regularly as she. [Sherman: affidavit, para. 16, 21]. GTE maintains that all employees of the GTE store were treated equally. Finally, the plaintiff has offered evidence that when Brannon punished her for the unsigned contract, he contradicted the standard office practice of placing the responsibility to obtain the signature with the employee who was working at the time the customer came into the office for activation, not the employee who initially checked the customer's credit. [Bunch: affidavit, para. 7; Sherman: affidavit, para. 7].

Additionally, the plaintiff claims that while she was employed at the GTE store, Brannon and co-worker Kay Norton, who was often in authority when Brannon was out of the office,

made comments about her age. [Smith: 31-33, 43, 88]. Plaintiff claims that many times while reprimanding her, Brannon would say things such as "You're old enough to know better" and "As old as you are and as long as you've been working, you should know better than this." [Id.]. She alleges that Norton often criticized her clothing, saying that it made her look like an old woman, and suggested several times that the plaintiff dye her gray hair. [Id.: 43]. Both Brannon and Norton deny saying anything of the sort to the plaintiff.[2]

Finally, the plaintiff claims that she told Brannon many times that she felt that she was being "singled out" for harsher treatment because of her age [Id.: 64-65, 87] and told John Leucke, the general retail manager, that her employment was being terminated because of her age. [Id.: 105-106]. Leucke denies hearing this statement. The plaintiff admits that she did not complain to higher GTE management before she spoke to Leucke about her discharge, and that she contacted the EEOC only after she had been terminated.

## ANALYSIS

### Whether the Plaintiff's claim is time-barred

In its Motion for Summary Judgment, the defendant's first contention is that the plaintiff's claim is time-barred because she did not file a charge of discrimination within 180 days of her discharge. A plaintiff who brings an action under the ADEA must first file a timely charge of discrimination with the EEOC or face dismissal of any subsequent suit. Jackson v. Seaboard Coast Line R.R., 678 R.2d 992, 1010 (11th Cir. 1982); Quillen v. American Tobacco Co., 874 F. Supp. 1285, 1292 (M.D. Ala. 1995).

---

[2] There is no evidence that Norton was a decision-maker. Her alleged statements would likely not be admissible evidence.

After the plaintiff's employment was terminated on September 9, 1997, she contacted the EEOC and received a Charge Questionnaire that she completed and returned to the EEOC by November 3, 1997. In arguing that plaintiff did not file a timely charge, the defendant relies upon sections 2.7 and 2.2(b) of the EEOC Compliance Manual that provide that a charge number be assigned to all charges and complaints that do not require further intake and require the EEOC to acknowledge the charge and to serve a copy of it on the respondent. The defendant reasons that because the plaintiff's complaint was not given a charge number until December 18, 1998 and was not served on GTE until March 1, 1999, it did not become an officially filed charge until sometime well after the 180-day deadline, either because the EEOC did not consider it to be a charge or because the 180-day requirement is such a bright line rule that it leaves no room for institutional backlog or delay.

The Plaintiff's situation is quite similar to that of the ADEA plaintiff in Clark v. Coats & Clark, Inc., 865 F.2d 1237 (11th Cir. 1989). In Clark, the plaintiff completed the intake questionnaire and sent it to the EEOC prior to the 180-day deadline. Id. at 1239. The EEOC did not prepare the formal charge and serve it upon the respondent until after the 180 days had expired. Id. Subsequently, the trial court awarded summary judgment on the grounds that the claim was time-barred because the charge was not timely filed. Id.

Reversing the award of summary judgment, the Eleventh Circuit gave great weight to the EEOC's interpretation of the filing requirements. Id. at 1240. The court relied on the section of the EEOC regulations promulgated to enforce the ADEA, entitled "Form of charge," which states that "A charge shall be in writing and shall name the prospective respondent and shall generally allege the discriminatory act(s)." Id. (citing 29 C.F.R. § 1626.6). The regulations, the

9

court found, were "in harmony with the congressional objectives in enacting the statue," which were "to provide the [EEOC] with sufficient information so that it may notify prospective defendants . . . ." Id. Specifically, with regard to the requirement of a written charge, the court concluded that congressional intent "will be satisfied by the filing of a written statement which identifies the potential defendant and generally describes the action believed to be discriminatory." Id. Applying these basic requirements to the case before it, the Eleventh Circuit found that the plaintiff's intake questionnaire was a sufficient charge because it was a written statement that described the defendant's allegedly discriminatory actions, thus enabling the EEOC to begin to take action upon the plaintiff's claim.

In the case at hand, the defendant does not dispute that the plaintiff completed and submitted the intake questionnaire with its 6-page, detailed, handwritten attachment on November 3, 1997, well within the 180-day deadline. The questionnaire clearly identifies the defendant and describes the allegedly discriminatory acts with specificity. Under the Eleventh Circuit's application of the EEOC's regulations, the plaintiff's completed intake questionnaire serves as the charge in this case, and was quite sufficient to enable the EEOC to begin to take action upon the plaintiff's claim.

After the plaintiff filed her charge, it was then the responsibility of the EEOC to provide notice to the defendant and to take action on the claim. 29 C.F.R. §§ 1626.11, 1626.15 (2000). The fact that the EEOC delayed its action was not the fault of the plaintiff, who fulfilled her responsibility to set the claim in motion within 180 days of her discharge. While the doctrine of laches may be applied for inexcusable delay by the EEOC against an action *brought by* the EEOC, "a plaintiff cannot be faulted for relying on the administrative process prior to the

issuance of a no-reasonable-cause determination." <u>Howard v. Roadway Express, Inc.</u>, 726 F.2d
1529, n2 (11th Cir. 1984)(citing <u>EEOC v. Dresser Industries, Inc.</u>, 668 F.2d 1199 (11th Cir.
1984); <u>Bernard v. Gulf Oil, Co.</u>, 596 F.2d 1249 (5th Cir. 1979)). Therefore, under current
Eleventh Circuit law, the plaintiff filed a timely charge of discrimination, and her action cannot
be undermined by the EEOC's administrative delay.

**Whether Summary Judgment should be granted on the merits**

**The standard for summary judgment**

A motion for summary judgment is to be granted if there is no genuine issue of material
fact. <u>United States v. Four Parcels of Real Property</u>, 941 F.2d 1428, 1437 (11th Cir. 1991). A
factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for
the non-moving party." <u>Id.</u> The evidence of the non-moving party is to be believed, and the
court is not to attempt to perform jury functions such as credibility determinations. <u>Id.</u> After
considering everything in the record, all permissible inferences are to be drawn in favor of the
non-moving party. <u>Clinkscales v. Chevron USA, Inc.</u>, 831 F.2d 1565, 1570 (11th Cir. 1987).

When the non-moving party has the burden of proof at trial, it must come forward with
sufficient evidence on each element that must be proved. <u>Earley v. Champion International
Corp.</u>, 907 F.2d 1077, 1080 (11th Cir. 1990). If the evidence is merely colorable or is not
significantly probative, summary judgment may be proper. <u>Anderson v. Liberty Lobby, Inc.</u>, 477
U.S. 242, 250, 106 S. Ct. 2505, 2511 (1986). Summary judgment is appropriate if on any
element there would be insufficient evidence to require submission of the case to a jury. <u>Earley</u>,
907 F.2d at 1080. "The plain language of Rule 56(c) mandates the entry of summary judgment
against a party who fails to make a showing sufficient to establish the existence of an element

11

essential to that party's case, and on which that party will bear the burden of proof at trial. In such circumstances, there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 327 S. Ct. 2548, 2555 (1986).

**Summary judgment in the instant case**

In a case brought under the ADEA, a plaintiff must first make out a prima facie case of age discrimination. Earley, 907 F.2d at 1081. The plaintiff can present a prima facie case by showing: (1) Direct evidence of discriminatory intent, (2) Statistical proof of disparate treatment, or (3) Circumstantial evidence of discrimination under the framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973) and its progeny. Id. In the instant case, the plaintiff has not introduced any evidence of discriminatory intent that is so specific and egregious that it may be considered direct. Id. (quoting Carter v. City of Miami, 870 F.2d 578, 581-582 (11th Cir. 1989)). Likewise, the plaintiff has not presented statistical evidence of disparate treatment. Therefore, the analysis of the plaintiff's case will be conducted under the McDonnell Douglas circumstantial evidence framework.

In order to make out a prima facie case of discriminatory discharge under the Eleventh Circuit's current construction of the McDonnell Douglas test, the plaintiff must present sufficient evidence that: (1) she was a member of the protected group of persons between the ages of forty and seventy; (2) she was subject to adverse employment action; (3) a substantially younger person filled the position from which she was discharged; and (4) she was qualified to perform the job from which she was discharged. Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1359 (11th Cir. 1999), cert. denied, 120 S. Ct. 1962, 146 L. Ed. 793 (2000); Turlington v.

12

Atlanta Gas Light Co., 135 F.3d 1428, 1432 (11th Cir. 1998).

It is undisputed that the plaintiff, at age 47, was a member of the protected age group when she was terminated from her position at GTE. In the Eleventh Circuit, the employee who replaces the plaintiff must be only three years younger than the plaintiff to qualify as "substantially younger." Damon, 196 F.3d at 1360 (citing Carter v. DecisionOne Corp., 122 F.3d 997, 1003 (11th Cir. 1989)). In this case, the employee who replaced the plaintiff, Sherry Maze, was 37 years old, ten years younger than the plaintiff, when she took over the plaintiff's position.

The fourth prong of the prima facie case, the "qualification" prong, gives rise to the defendant's next argument. The defendant claims that it deserves summary judgment because the plaintiff cannot prove that she was qualified for her position. According to the defendant, the plaintiff's alleged "poor performance" as an employee indicates that she was unqualified to be a sales representative.

In the Eleventh Circuit, "we have focused on plaintiffs' skills and background to determine if they were qualified for a particular position." Damon, 196 F.3d at 1360; Clark v. Coates & Clark, Inc., 990 F.2d 1217, 1227 (11th Cir. 1993). Allegations of poor employee performance in cases in which the employee was discharged from a previously held position are more properly raised at the "pretext" phase of the analysis. Clark, 990 F.2d at 1227. However, in the past, the courts have allowed plaintiffs to establish that they were qualified by introducing evidence that they had performed the job either without complaint or with favorable reviews. Baker, 903 F.2d at 1520; Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991). "If the employee relies on satisfactory job performance to establish his qualifications, evidence

of poor job performance may also be relevant at the prima facie stage." Clark, 990 F.2d at 1227 n3.

Focusing on her skills and background in sales, the plaintiff has introduced sufficient evidence for a reasonable juror to find that she was qualified for the job as sales representative at GTE. For ten years prior to working at GTE, the plaintiff sold cosmetics. At the time that she was discharged from GTE, she had spent a year working as a sales representative, often leading the store in sales. Even Brannon admitted that the plaintiff had above-average ability in selling merchandise and that she had no problems "meeting her quota."

Nevertheless, the defendant argues that the plaintiff was unqualified for her position because of her "poor performance," specifically, the alleged misconduct for which she was ultimately terminated. It cites Baker in support. In Baker, the Eleventh Circuit found that the plaintiff, also a sales representative, was unqualified for her position because of her poor job performance. 903 F.2d at 1520. The evidence showed that while the plaintiff had excelled in selling one kind of product, she had consistently failed to meet her quota in the sale of another, equally important, kind of product. Id. Since the employee had, overall, failed to meet her sales quota year after year, the court found that she was unqualified. Id. In contrast, in Elrod, a case that was decided after Baker, the court decided that the plaintiff had introduced sufficient evidence that he was qualified for his job, in spite of the fact that he was terminated because of repeated reprimands for sexual harassment. 939 F.2d at 1470. The difference between the two cases, as well as the difference between the plaintiff's case and Baker, is that "poor employee performance" as applied to the qualification prong of the prima facie case implies that the plaintiff does not have the skills to perform the required tasks of the job. Employee misconduct,

14

especially if it is the reason given for the plaintiff's termination, is an aspect of employee performance that, as Clark prescribed, is better left to the pretext inquiry.  990 F.2d at 1227.

The defendant also has committed two paragraphs of its motion to suggesting that even if it is found that the plaintiff was qualified for her position, she still has not made out a prima facie case of age discrimination because she cannot demonstrate that other similarly situated employees were treated differently.  While it is true that introducing sufficient evidence of similarly situated employees receiving different treatment than the plaintiff may be a prima facie requirement in some cases under Title VII, Holifield v. Reni, 115 F.3d 1555, 1562 (11th Cir. 1997), it is not always an element of the prima facie case under the ADEA.  See Turlington, 135 F.3d at 1432.  Therefore, whether the plaintiff has or has not introduced sufficient evidence of other similarly situated employees receiving different treatment is not relevant at this stage of the inquiry.

The plaintiff has introduced sufficient evidence to overcome her prima facie hurdle. Following the McDonnell Douglas framework, the defendant now has the burden to produce evidence of a legitimate, non-discriminatory reason for terminating the Plaintiff's employment. St. Mary's Honor Ctr. v. Hicks, 209 U.S. 502, 510, 113 S. Ct. 2742, 2749 (1993).  The defendant's non-discriminatory reason, which it describes and documents at great length in the record, can be summed up as "continual violation of company policy and procedure."

The burden now shifts back to the plaintiff to produce sufficient evidence to allow a reasonable jury to find that the defendant's articulated reason is a pretext for age discrimination. Damon, 196 F.3d at 1361.  At the summary judgment stage, the proper inquiry is whether a jury "'could reasonably infer discrimination if the facts presented by the plaintiff remain unrebutted.'"

Id. (quoting Jameson v. Arrow Co., 75 F.3d 1528, 1531 (11th Cir. 1996)).  The court is to "avoid weighing conflicting evidence or making credibility determinations.  Rather, 'the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.'"  Id. (quoting Hairston v. Gainesville Sun Publishing Co., 9 F.3d 913, 918 (11th Cir. 1993)).

In the instant case, the plaintiff has introduced three types of evidence.[3]  The first category of evidence that the plaintiff has presented is evidence that the reprimands that she received were a result of Brannon's manipulating the facts and deliberately ignoring the truth.  The second category of evidence presented is evidence that Brannon disciplined her more harshly than he disciplined the younger employees.  The plaintiff has presented evidence that, when disciplining her, Brannon did not follow his usual disciplining policies.  Brannon refused to discipline other employees for acts that he did not witness.  When it was brought to his attention that employee Stephanie Bunch had used profanity toward a delivery person in front of customers and that employee Sherry Maze had been taking excessive lunch breaks, he took no action disciplinary against them because he did not witness it. [Brannon: 152-153, 149-150].  However, he was not present at the store to witness the plaintiff lock the door or talk to the drunken customer, actions for which he gave the plaintiff her first written reprimand. [Brannon: 84].  Brannon also would not discipline employees for customer complaints that did not come directly to him. [Brannon: 128-129].  He did not discipline employee Sherry Maze for customer complaints about her because they were not made directly to him. [Brannon: 152].  However, he disciplined the plaintiff for the customer complaint on August 17, 1997 based on a note written

---

[3] For the purposes of this motion, the court accepts the plaintiff's versions.  The court does not find that they are either true or false.

16

by employee Kay Norton. [Norton: 36-38; Brannon: Ex. 6].

The plaintiff also has presented evidence that Brannon did not follow standard office procedure when he disciplined her for the unsigned contract. Brannon held the plaintiff responsible for the unsigned contract even though there is evidence that the standard office procedure placed the responsibility to obtain the signature with the sales representative who was working at the time, not necessarily the representative who performed the credit check. [Brannon: Ex. 4; Bunch: affidavit, para. (7); Sherman: affidavit, para. (7)].

The plaintiff has presented evidence that she was singled out for harsher treatment than the younger employees. When customer Scott Grimes complained to Brannon personally that employee Kay Norton had been rude to him, Brannon did not issue a written reprimand to Norton. [Grimes: affidavit, para. 2-3; Brannon: 142]. Brannon reprimanded Norton only once, even though there is evidence that she took excessive lunch breaks, used office equipment for personal business while "on the clock," and frequently violated the office dress code. [Brannon: 142; Sherman: affidavit, para. 5, 17, 21]. The only time that Brannon issued a written reprimand to Kay Norton– for using the office fax machine to send lewd jokes to her wedding reception disc jockey– he did so only after he was ordered to by higher management. [Brannon: 140-141]. Finally, after Brannon issued written reprimands to employees, he would not always report the reprimands to the Human Resources office. [Brannon: 145]. However, in the plaintiff's case, every reprimand was reported and sent to the Human Resources office. [Brannon: ex. 5].

The third category of evidence that the plaintiff has presented is evidence that Brannon made age-related comments to her personally and made age-related comments about her to other employees in the store. While none of this evidence rises to the level of "direct evidence," it may

17

nonetheless have circumstantial weight.

The defendant has listed five reasons that the plaintiff cannot demonstrate that GTE's articulated reason for discharging her is a pretext for age discrimination: (1) Brannon did not know the Plaintiff's age; (2) The fact that Brannon both hired and fired the plaintiff may give rise to a permissible inference that no discriminatory animus motivated his actions; (3) The fact that both Brannon and Luecke were themselves over forty when they discharged the plaintiff weighs against finding that age motivated their decision; (4) The employer had a good faith belief in its proffered reason for discharging the plaintiff; and (5) The EEOC, after investigating the plaintiff's claim, did not find that the law was violated.

None of the defendant's enumerated reasons implicates a fatal flaw in the plaintiff's claim as a matter of law. That Brannon knew the plaintiff's exact age when he terminated her is not required under the ADEA. Carter v. DecisionOne Corp., 122 F.3d 997, 1003 (11th Cir. 1997). While the fact that Brannon both hired and terminated the plaintiff *may* give rise to an inference that he did not discharge her because of her age, it is a permissible inference for the finder of fact, not a presumption to be considered by the court. Williams v. Vitro Servs. Corp., 144 F.3d 1438, 1443 (11th Cir. 1998)("it is the province of the jury rather than the court, however, to determine whether the inference generated by "same actor" evidence is strong enough to outweigh a plaintiff's evidence of pretext."). That both Brannon and Leuke were over the age of 40 when the plaintiff was discharged and that the employer believed in good faith in its nondiscriminatory reasons for discharging her are both factual issues that must be proven and weighed by a jury. Finally, the EEOC's finding the plaintiff's facts insufficient to pursue a charge also must be weighed by a finder of fact. At this stage of the litigation, the court is not to

18

weigh conflicting evidence, but instead is to believe the plaintiff's facts and draw all justifiable inferences in her favor. Damon, 196 F.3d at 1361.

If the plaintiff's evidence is believed, the evidence that she has presented of the circumstances surrounding Brannon's reprimands, coupled with the evidence of Brannon's leniency in disciplining the younger employees, with the strand of age-related comments from Brannon running throughout, could lead a reasonable juror to find that Brannon's excuse for discharging her is a pretext for age discrimination. If Brannon manipulated the circumstances of the documented reprimands or deliberately ignored the truth in order to reprimand the plaintiff and then used those reprimands as the reason for her discharge, an inference of age discrimination could arise. In addition, the age-related comments about the plaintiff and the discrepancies in the discipline that she and the younger employees received could lead a reasonable juror to conclude that, for whatever reason, Brannon's decision to discharge the plaintiff was based on her age.

Again, the court does not weigh the evidence. It is difficult to understand why someone would want to terminate the employment of a high-producing employee simply because of her age, which certainly cannot be considered "old." The court is also aware that the issue is not whether the employer made a mistake, used bad judgment, or even was carrying out a personal vendetta against the plaintiff. The issue is age animus *vel non*.

Judges do not always agree. The Supreme Court disagreed with the Fifth Circuit in Reeves v. Sanderson Plumbing Products, Inc., 120 S. Ct. 2097 (2000). At this point, the court cannot decide the case as a matter of law. The court will, however, carefully listen to the evidence at trial. Sometimes even weak cases must be tried. One can wonder if we ever really

19

find the truth, or if we just play the game to see who wins.[4]

**Conclusion**

Based on the foregoing, the defendant's motion for summary judgment will be denied.

This __31__ day of August, 2000

ROBERT B. PROPST
**SENIOR UNITED STATES DISTRICT JUDGE**

---

[4] The uncertainty of the rules of the "game" is indicated by the attached U.S. Law Week article.

# Analysis&Perspective

### Employment Discrimination—Procedure

## Reeves Clarifies Aspects of Proving Job Bias But Poses Questions for Summary Judgment

Near the end of the recent term, the U.S. Supreme Court decided that an employment discrimination plaintiff who presents evidence that the employer's explanation for its employment decision is false need not necessarily present additional, "pretext plus" evidence to prevail in a disparate-treatment case. Instead, the court held in *Reeves v. Sanderson Plumbing Products Inc.*, 68 U.S.L.W. 4480 (U.S. 2000), that such a plaintiff can prevail merely if a jury chooses to infer discriminatory intent from the evidence making out the prima facie case together with the evidence that the employer's explanation for its decision was pretextual, so long as a reviewing court can find the evidence sufficient for a reasonable jury to infer such an intent.

But the plaintiff in *Reeves* presented a good deal of "plus" evidence, including testimony from other employees and evidence that decisionmakers made statements indicating age bias. Hence, the case did not present the issue that the Supreme Court decided: whether a prima facie case and proof of pretext, alone, can support a jury's finding for a plaintiff. The court thus made a broad ruling in a case that appeared to call for a narrow one. In fact, it could be argued that this ruling, which was not required by the facts of the case, is actually dictum.

This is one reason to marvel at the fact that the decision was unanimous. Another is how it reploughs, to such a different effect, a landscape first tilled by *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993). *St. Mary's* was a contentious ruling. It set out to destroy any belief that proof of pretext, alone, was inherently enough to prove discrimination. But Justice Antonin Scalia also acknowledged that a "factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination." Rejection of the defendant's proffered reasons could permit, though not require, a factfinder to infer the ultimate fact of intentional discrimination, Scalia added. Because his opinion did not elaborate on this matter, it offered little guidance and left the lower courts uncertain how to analyze such a case. They consequently expended much energy in disagreeing over what *St. Mary's* had wrought.

**More Weight to Employer Mendacity?** Perhaps a major reason why *Reeves* was unanimous and *St. Mary's* was not is that *Reeves* seems to have given more weight than *St. Mary's* did to the effect of a lie by the employer. *St. Mary's* held that any presentation of evidence—truthful or otherwise—by an employer that could be viewed on its face as plausible would suffice to rebut a prima facie case and force the plaintiff to establish pretext; it left the evidentiary impact of false testimony by the employer uncertain and seemed to take a position of moral neutrality with regard to falsehood. But *Reeves* makes it clear that false evidence by an employer, while not requiring a factfinder to rule for the plaintiff, is a valid justification for a verdict in favor of the plaintiff. Perhaps a rule will develop that when there is evidence of dishonesty, the case is to be submitted to the jury, with the verdict being reviewed on a motion for judgment as a matter of law if documentary or other uncontroverted evidence adverse to the verdict is in the record.

*Reeves* virtually transforms *St. Mary's* into a decision good only for its basic holding that a plaintiff must tie the showing of pretext to a finding of discrimination; it has otherwise been superseded by *Reeves*. The shelf life of *St. Mary's* was short because its analysis was not understood and accepted by the judiciary.

**New Rule on Probative Evidence?** *Reeves* may perhaps best be interpreted as a ruling on evidence rather than on burden of proof. Its author, Justice Sandra Day O'Connor, was the same justice who in her concurring opinion in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)—concerning the mixed-motive method of analysis—first articulated the concepts of "stray remarks" and "direct evidence." These phrases spawned new doctrines and controversies and were used by many judges to limit the reach of Title VII of the 1964 Civil Rights Act in disparate-treatment decisions, even though O'Connor used the phrases to help define when mixed-motive analysis was proper; she did not lay down evidence rules for disparate-treatment decisions.

But the court has now ruled in *Reeves* that statements can be probative in disparate-treatment cases even if they do not directly address the challenged employment decision. Thus, a general derogatory remark about race or age not tied to the specific decision or the specific litigant is not automatically irrelevant; the question is whether the remark is an indicator that the decision was the result of discriminatory animus. Moreover, a remark about a promotion decision is not automatically excludable in a hiring case. It is not clear how it ever could have been thought that a bias-tinged remark in such a situation could have no evidentiary value. But *Reeves* now makes it clear that evidence that could shed any light on the employer's true motive must be allowed in and must be given full respect in evaluating the work of a jury.

**Fight Moves to Summary Judgment.** The presence of such evidence almost certainly bars the grant of summary judgment—and enhances the settlement value of a case. Summary judgment is likely to be the next field of battle. Because *Reeves* involved a post-trial ruling on a motion for judgment as a matter of law, it is not clear how some of its concepts will translate into the pre-trial summary-judgment process. The court's opinion reiter-

ated the statement in *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242 (1986), and *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), that the standard for granting summary judgment "mirrors" that for granting judgment as a matter of law. But it did so for the proposition that courts must review all of the evidence in the record in entertaining a motion to overturn a judgment after trial. Does this mean that courts must also give evidence being presented in the context of a summary judgment motion the same respect that evidence already evaluated by a jury must be given? Summary judgment evidence has not been tested on the witness stand; while it can be controverted by contrary summary judgment evidence, it has not been subjected to cross-examination. If the same degree of deference given to evidence introduced at trial were given to evidence submitted before trial, it would seem that plaintiffs could almost always manufacture enough to avoid summary judgment. But did the court mean to make Fed.R.Civ.P. 56 virtually irrelevant in a discrimination case?

Some types of evidence would appear to have more anti-summary-judgment firepower than others, such as a lie by an employer on a material fact or a statement suggestive of discriminatory animus (depending on the strength of the suggestion of bias). If the rules of evidence would allow a factfinder to believe this evidence, a court would be required to let the factfinder determine whether the challenged decision was discriminatory, even if the plaintiff could not muster evidence at the summary judgment stage directly attacking the employer's stated justification for that decision. But less direct evidence of the employer's state of mind might not be entitled to the same deference; the extent of the deference to be given such evidence in the summary judgment context is unknown.

**'Mirror' Comment Questioned.** All in all, it seems clear that the standard for summary judgment cannot truly mirror that of judgment as a matter of law in evaluating evidence. The general issue, to be sure, is the same: what the jury reasonably can infer. But before the trial a court can only speculate on what the jury will hear and how the jury might view the case, whereas after trial the deed is done and the court has to determine whether there was any legally sufficient basis for what the jury did. Some years ago the Seventh Circuit upheld a jury verdict for a plaintiff but admitted that it might have upheld summary judgment against her had it been presented with the case before trial. *Emmel v. Coca-Cola Bottling Co. of Chicago*, 95 F.3d 627 (7th Cir. 1996).

Twice the *Reeves* court pointed out that the manufacturing director backtracked on cross-examination from positions that he took during his direct testimony. Is this observation relevant to the question of when summary judgment can be granted? Many courts have ruled that the plaintiff cannot avoid summary judgment by relying on the possibility of showing at trial that the employer lied. But if proof of a lie can justify a verdict for a plaintiff, why cannot evidence that the employer may be lying justify the rejection of summary judgment? After trial, a reviewing court focuses on whether

the evidence presented actually supported the verdict reached; but before trial a court has a more diffuse task—to determine whether the possible evidence could justify a verdict against the party seeking summary judgment. This is an indication that the standards for reviewing a party's case after trial cannot be the same as the standards for evaluating it before trial.

Now the Supreme Court has made summary judgment more difficult by making more types of circumstantial evidence more relevant to the analysis. Juries do not necessarily analyze evidence the way law-trained judges do, and judges should not presume to be surrogates for juries. As Judge Richard A. Posner observed in *Shager v. Upjohn Co.*, 913 F.2d 398 (7th Cir. 1990): "A judge's decision to grant a motion for summary judgment may be a good predictor of the outcome of a bench trial before the same judge; it may not be a good predictor of the outcome before a jury." Congress deliberately wanted juries to handle discrimination cases; it wrote a jury trial provision into the Age Discrimination in Employment Act, and it authorized jury trials whenever damages were being sought under Title VII. A trial is not a law school examination for juries. Judges who review jury verdicts have to accept possibilities, not certainties.

**Other Questions Remain.** In fact, in light of *Reeves*, judges have to accept the outcome found by the jury unless they can say with positive assurance that such an outcome was not rationally warranted by the facts; in close cases, the verdict is to be upheld. *Reeves* strongly suggests that a reviewing court may not overturn a jury's pro-plaintiff verdict unless an employer introduces strong evidence that it could not have engaged in discrimination. As Justice Ruth Bader Ginsburg pointed out in a brief concurring opinion, the court does not define with particularity the type of evidence that will justify rejecting a jury's determination. Must the evidence be objective in nature, such as a document? Must it be positive evidence of another motive for the decision? Must it be unchallenged by the plaintiff? The answer is not known, but it appears that the employer has a heavy burden and that the deference normally given to a jury verdict in other types of cases is to be applied in a discrimination case too.

*Reeves* may also doom the view that job performance may be considered in determining whether a plaintiff has satisfied the qualifications element of a prima facie case. Some courts, most strongly the Seventh Circuit, take the position that a plaintiff who cannot show that he met the employer's legitimate performance expectations cannot satisfy that element and therefore cannot make out a prima facie case. See *Kephart v. Institute of Gas Technology*, 630 F.2d 1217 (7th Cir. 1980), and its progeny. But the *Reeves* court, after describing the supervisor's alleged faults, said that he was "otherwise qualified" for his job. Although the court was not asked to address this dispute, this choice of language indicates that the court would reject the Seventh Circuit's position.

By Stephen S. Rappoport

COPYRIGHT © 2000 BY THE BUREAU OF NATIONAL AFFAIRS, INC., WASHINGTON, D.C.    LW    ISSN 0148-8139